UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANTHONY HEITZ,                                     :

                                                   :      OPINION AND ORDER
                      Plaintiff,                          15 Civ. 3456  (GWG)
                                                   :
              -v.-
                                                   :

COMMISSIONER OF SOCIAL SECURITY,                   :

                                                   :
                      Defendant.
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Anthony Heitz brings this action under 42 U.S.C. § 405(g) and 1383(c)(3)

challenging the Commissioner of Social Security's decision to deny his claim for disability

insurance benefits under the Social Security Act ("SSA").  On October 22, 2015, Heitz moved

for judgment on the pleadings.  See Notice of Motion for Judgment on the Pleadings, filed Oct.

22, 2015 (Docket # 10); Memorandum of Law in Support of Plaintiff's Motion for Judgment on

the Pleadings, filed Oct. 22, 2015 (Docket # 11) ("Pl. Mem.").  The Commissioner has also

moved for judgment on the pleadings.  See Notice of Cross-Motion, filed Dec. 7, 2015 (Docket #

15); Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the

Pleadings and in Opposition to the Plaintiff's Motion for Judgment on the Pleadings, filed Dec.

7, 2015 (Docket # 16) ("Comm. Mem.").  For the reasons stated below, the Commissioner's

motion is granted.

I.        BACKGROUND

          A.        Heitz's Claim for Benefits and Procedural History

Heitz filed an application for benefits on July 31, 2012, alleging disability that began on

October 1, 2011.  See SSA Administrative Record, filed Sept. 8, 2015 (Docket # 7) ("R."), at 10.

On November 2, 2012, the Commissioner denied Heitz's application, and Heitz filed a written

request for a hearing before an administrative law judge ("ALJ") to dispute this finding.  Id.  On

December 17, 2013, a video hearing was held before ALJ Katherine Edgell, during which Heitz

was represented by an attorney.  Id.  On March 26, 2014, the ALJ issued a decision finding that

Heitz was not disabled.  R. 10-16.  The Appeals Council denied Heitz's request for review on

April 24, 2015, making the ALJ's determination the Commissioner's final decision.  R. 1-5.

Heitz filed the instant lawsuit to review that determination on May 4, 2015.  See Complaint, filed

May 4, 2015 (Docket # 1).

      B.     The Administrative Record

Heitz and the Commissioner have each provided a summary of the medical evidence

contained in the administrative record.  See Pl. Mem. at 2; Comm. Mem. at 4-8.  The Court

adopts the parties' summaries, which do not conflict in any material way, as accurate and

complete for purposes of the issues raised in this suit.  We discuss the portions of the medical

record pertinent to the adjudication of this case in section III below.

      C.     The Hearing Before the ALJ

A hearing was held before an ALJ on December 17, 2013.  R. 20-40.  The hearing was

held by video-conference and Heitz was represented by attorney Charles Hoiser.

Heitz testified that he was 61 years old and was living in Middletown, New York with his

wife.  R. 23-24.  His home is a private residence that has one flight of stairs, with eleven steps,

that he climbs regularly.  R. 23.  Heitz is 5 feet, six inches tall, weighs approximately 178

pounds, and is left-handed.  R. 24.  He graduated from high school but has undertaken no

additional training or schooling.  R. 25.

2

Prior to the inception of his disability in October 2011, Heitz worked for the Department of Sanitation, where his responsibilities included lifting garbage onto trucks. R. 25, 31. He held this position for 20 years until he took an "ordinary" retirement in January 2005. R. 30-31. After working in sanitation, Heitz worked as a nighttime security guard from January 2006 to December 2008. R. 28; see also R. 166. Heitz was generally assigned to provide security for buildings that were under construction. R. 30. He would usually drive his own car or take the train to the site, and then patrol the building to make sure no one was stealing materials or otherwise on site when they should not be there. See id. As described by Heitz, the position consisted mostly of "checking [on] construction buildings . . . climb[ing] up and down steps, [and] check[ing] various floors." R. 28. After leaving his security position, Heitz worked as an exterminator for a pest control company. R. 25-26; see also R. 166. As an exterminator, his primary job responsibilities included "[l]oading truck[s] [with] chemicals, [and] applying chemicals," R. 147, as well as "putting out bait stations and baiting the stations," R. 26. This position required him to frequently lift hoses, ladders, and chemical tanks weighing 50 pounds or more, and that he often needed to kneel, crouch, crawl, handle large objects, and reach. R. 147.[1] Heitz testified that in his role as an exterminator he would often work in a two-person team, as either the driver or "ride-along." R. 26-27. He worked in this position from January 2009 to October 2011, when he "[s]tarted getting fatigued [and] dizz[y]," and could not climb anymore to bring bait stations where they needed to go. R. 27, 166.

Beginning around the end of October 2011, Heitz began to suffer from "a lot of fatigue," and have "a hard time breathing," as well as "dizziness" upon walking for more than 10 minutes

---

[1] Most of these responsibilities were provided by Heitz in a SSA Work History Report, but not mentioned at the administrative hearing. Compare R. 25 with R. 147.

3

or after any kind of lifting.  R. 32.  He further stated that his difficulty breathing prevents him from "sleep[ing] all night long," R. 33, and that upon sitting for "any length of time, [his] leg goes numb," R. 37.  Starting in 1991, Heitz also suffered from pain in his thumb, which now prevents him from using it.  R. 39; see also R. 162.  He also visits a doctor regularly to treat his diabetes, which he  "control[s] . . . with diet and . . . medicine."  R. 33-34.  Heitz uses an Advair inhaler in the morning and a smaller inhaler throughout the day.  R. 33.

Heitz testified regarding the extent to which his symptoms restricted his daily life.  He testified that he lived in a multi-story residence and could regularly climb the 11 steps in his home.  R. 23.  With regard to daily chores, Heitz's wife does all the cooking, cleaning, and washing at the house.  R. 36.  She also handles all the chores outside the home, including mowing and tending the garden, as well as "all the bills."  Id.  Heitz has never smoked, does not drink alcohol, and spends most of his time during the day sitting down, reading, watching television, and occasionally doing puzzles.  R. 36-37.  He can also use the microwave and make a sandwich on his own.  R. 37.  Heitz drives a "minim[al]" amount, R. 25, and occasionally attends church with his wife, but cannot stay in the car too long or his leg will go numb, R. 37.  He stated that the most he can lift is 15 pounds.  R. 38.

D.      The ALJ's Decision

On March 26, 2014, the ALJ ruled that Heitz had not been under a disability since October 1, 2011.  R. 16.  The ALJ's decision begins by finding that Heitz met the insured status requirements of sections 216(i) and 223 of the SSA, making an evaluation of his alleged disability appropriate.  R. 10, 12.  Next the ALJ applied the five-step sequential evaluation process described in the Social Security regulations for determining whether an individual is disabled.  R. 12-16; 20 C.F.R. 416.920(a).  First the ALJ found that Heitz had not engaged in

substantial gainful activity since October 1, 2011, the date of the onset of symptoms tied to the alleged disability.  R. 12.  Second, she found that Heitz suffered from the following severe impairments: "diabetes mellitus, mild osteoarthritis of the knees, asymptomatic hernia, sleep apnea, chronic obstructive pulmonary disease (COPD) by chest x-ray; distant history of right thumb fusion in 1990."  R. 12-13.  Third, the ALJ found the Heitz did not suffer from an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  R. 13.  Next, the ALJ determined that Heitz retained the residual functional capacity ("RFC") to "perform medium work, as defined in 20 CFR 404.1567(c) except for work requiring lifting carrying 20 pounds frequently and 50 pounds occasionally, or frequent exposure to concentrated smoke, fumes, chemical dust or work hazards due to dizziness and daytime fatigue."  Id.  As addressed in section III.B.1 below, the lifting limitation appears to be a drafting error.

The ALJ noted that Heitz testified he suffered from fatigue, shortness of breath, dizziness, and an injury to the thumb, which prevented him from working.  Id.  She also mentioned that Heitz had stated he was limited to lifting or carrying items up to 15 pounds and could only stand or walk for 15 minutes at a time.  Id.  She found, however, that Heitz's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible."  R. 14.  The ALJ then discussed the medical evidence upon which she relied in reaching this conclusion regarding Heitz's RFC.

With regard to Heitz's thumb pain and injury, the ALJ noted that medical records showed Heitz had undergone a "right thumb fusion in 1990," but that he was thereafter able to work for

more than 20 years[2] performing work that "involved heavy lifting, carrying[,] and climbing," and currently constructs jigsaw puzzles, all of which support the notion that Heitz's thumb limitation is not as severe as he suggests.  R. 14.  Additionally, during a consulting examination conducted by Dr. Samuel Balderman in October 2012, Dr. Balderman found Heitz possessed "intact hand and finger dexterity."  R. 14.

As to Heitz's allegations of limitations on his movement, the ALJ highlighted that although treatment notes in the administrative record indicate a history of osteoarthritis at multiple sites, physical examinations of Heitz show "no evidence of joint pain, or swelling," R. 14, and that in Dr. Balderman's October 2012 examination, Heitz had "a normal gait and station; he could walk, do a full squat and move around the examining room without difficulty." Id.  The ALJ also mentioned Dr. Balderman's finding that Heitz suffered no instability or tenderness, redness, heat, swelling or effusion in any of the major joints and was "neurologically intact in the upper and lower extremities, with no evidence of muscle atrophy, sensory deficit or weakness."  Id.  The ALJ noted that although Heitz testified to limitations in mobility due to arthritic pain in his knees, he has received no treatment or medication for arthritis.  Id.

With regard to Heitz's allegations of fatigue, shortness of breath, and chest pain, the ALJ reviewed office notes and reports from Dr. Concetto A. Rametta.  Id.  She highlighted that these notes reflect "few, if any complaints of shortness of breath, except when exercising," from 2011 to 2013 and that X-ray results from March 2012 show atelectic changes, but no lung masses or infiltrates.  Id.  The ALJ also mentioned a later cardiac evaluation and cardiac catheterization performed on Heitz in May 2012, which was also negative and "show[ed] no evidence of

---

[2] This is mistakenly referred to by the ALJ as 30 years.

coronary artery disease (CAD) or wall motion abnormalities and a normal ejection fraction of 50%." Id. She also highlighted that Heitz's July 2012 spirometry analysis came back normal at 99%. Id. The ALJ noted that, according to Dr. Rametta, Heitz was trying to get "'9/11' disability," irrespective of the fact that he was both "actively searching for work," and "willing and ready to work," as he reported in his efforts to obtain unemployment benefits from October 2011 to the 3rd quarter of 2012. Id.; accord R. 201 (noting that Heitz "is trying to get disability regarind [sic] 9-11.")

The ALJ then reviewed evidence related to Heitz's alleged sleep and breathing problems. She noted that in September 2012 a polysomnography was performed, which showed "severe sleep apnea," but that Heitz does not use a continuous positive airway pressure ("CPAP") machine and relies only on inhalers for shortness of breath. R. 14. The ALJ discounted some of Heitz's testimony regarding his daytime sleepiness and fatigue, noting that he "currently drives a car occasionally, which requires concentration and operating a hazardous machine." Id.

The ALJ also acknowledged a number of conditions that Heitz appeared to be able to control and thus did not severely restrict Heitz. These included a "hiatal/ventral hernia, which is 'asymptomatic'" and a "small normal-appearing nodule in the left lower lobe," of the thyroid. R. 14. The ALJ also acknowledged that Heitz was diagnosed with diabetes mellitus in 2006, but stated that he appeared to be able to control it well with diet and medication, notwithstanding his noncompliance with blood sugar testing. R. 14.

The ALJ then discussed the medical opinion evidence in the administrative record and the degree of weight she had granted it. First, she reviewed Dr. Rametta's conclusion that Heitz could lift or carry items weighing from 20 to 50 pounds, but that he could stand or walk for only two hours at a time. R. 15. The ALJ gave this opinion little weight, noting that Dr. Rametta had

7

not provided a diagnosis or supportive findings tied to these conclusions, "except to state that

[Heitz] 'developed shortness of breath' (SOB)." Id.  The ALJ found Dr. Rametta's findings "not

well supported by [Dr. Rametta's own] treating notes" and "contradicted by significant other

medical evidence of record." Id.  Specifically, the ALJ highlighted that Dr. Rametta's own

"notes reflect[] no more than sporadic complaints of SOB," and that both Heitz's clinical exams

and his July 2012 spirometry were normal.  Id.; compare R. 200, 201, 204, 207-09 (notes

indicating history of shortness of breath) with R. 202-03, 205-06, 210-14 (making no reference

to Heitz suffering or complaining of shortness of breath)  The ALJ did, however, grant some

weight to Dr. Rametta's conclusion that Heitz "has some moderate lifting limitations," in light of

Heitz's asymptomatic hernia and early arthritis of the knees.  Id.  She also granted "significant

weight" to consulting examiner Dr. Balderman's October 2012 opinion that Heitz "had [a] mild

limitation for repetitive use of the right hand for repetitive motor work, as well as mild limitation

in repetitive kneeling and climbing." Id. (internal quotation marks omitted).  The ALJ based her

award of such weight on Dr. Balderman's examination of Heitz, which resulted in "benign exam

and findings, other than slight reduction in range of motion of the knee and in right grip." Id.

After listening to Heitz's hearing testimony and reviewing the entire record, the ALJ

determined that Heitz:

> has the residual functional capacity to perform medium work, lifting/carrying 20 pounds,
> frequently and 50 pounds, occasionally. [He] can sit, stand and/or walk for 8 hours in an
> average workday; he can climb, and kneel, and perform repetitive manipulation
> frequently (6 out of 8 hours throughout an 8-hour workday). [Heitz] cannot be exposed to
> concentrated amounts of smoke, fumes, chemicals and dust, or frequently exposed to
> workplace hazards due to dizziness and daytime fatigue.

R. 15.  This conclusion, the ALJ opined, was

> supported by infrequent complaints of SOB; mild osteoarthritis of the knees; the fact that
> [Heitz] worked for approximate [sic] 30 years after his right thumb fusion, perform[ed]

jobs that required carrying, climbing and heavy lifting; [Heitz's] current ADL's which (per testimony) include . . . doing jigsaw puzzles and occasional driving and, Dr. Balderman's opinion, which is given significant weight.

Id.

Taking into account this level of RFC, the ALJ then found that Heitz was "capable of performing past relevant work as [a] [s]ecurity [g]uard and [e]xterminator." Id. She noted that Heitz's earlier work in sanitation was described as "very heavy," but that his prior work in security was deemed "light" and as an exterminator, "medium." Id.

Accordingly, the ALJ found that Heitz had not been under a disability, as defined by the SSA, from October 1, 2011, through the date of her decision, March 26, 2014. R. 16.

II.    APPLICABLE LAW

    A.    Scope of Judicial Review Under 42 U.S.C. §§ 405(g) and 1383(c)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citation and quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) (2012) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); id. § 1383(c)(3) ("The final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)); accord McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.") (citation omitted). The Second Circuit has characterized the "substantial evidence" standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam) (citation omitted). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. at 448 (emphasis in original) (citation and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citation and internal quotation marks omitted).

B.     Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord id.

10

§ 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 404.1520(c). Third, if the claimant's impairment is severe and "meets or equals" one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, and "meets the duration requirement," the claimant must be found disabled. Id. § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment does not meet or equal one of the listed impairments, or does not meet the duration requirement, the Commissioner must review the claimant's residual functional capacity

11

to determine if the claimant is able to do the work he or she has done in the past, i.e., "past relevant work." Id. § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity, in addition to his or her age, education, and work experience, permit the claimant to do other work. Id. § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. Id. The claimant bears the burden of proof on all of these steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.   DISCUSSION

       Heitz seeks reversal or remand of the ALJ's decision on the grounds that the ALJ failed to apply the correct legal standard to the opinion of Heitz's treating physician and that the ALJ's decision was not supported by substantial evidence.

       A.   Treating Physician Rule

       In general, the ALJ must give "more weight to opinions" of a claimant's treating physician when determining if the claimant is disabled. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician") (citation omitted). Treating physicians "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ must accord "controlling weight" to a treating physician's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically

12

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  Id. §§ 404.1527(c)(2), 416.927(c)(2). Inversely, the opinions of a treating physician "need not be given controlling weight where they are contradicted by other substantial evidence in the record," Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted), or are "'internally inconsistent,'" Vanterpool v. Colvin, 2014 WL 1979925, at *14 (S.D.N.Y. May 15, 2014) (quoting Duncan v. Astrue, 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011)).

If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide "good reasons" for the weight given to that opinion.  Halloran, 362 F.3d at 32-33 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)) (internal quotation marks omitted). When assessing how much weight to give the treating source's opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include: (I) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant evidence.  See 20 C.F.R. §§ 404.1527(c), 416.927(c); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. § 404.1527(c)(2)-(6)).  Although an ALJ must "comprehensively set forth reasons for the weight assigned to a treating physician's opinion," Halloran, 362 F.3d at 33, where the record itself makes clear the reasoning behind an ALJ's decision, "we do not require that he have mentioned every item of testimony . . . or have explained why he considered particular evidence unpersuasive or insufficient."  Petrie v. Astrue,

412 F. App'x 401, 407 (2d Cir. 2011) (summary order) (citing <u>Mongeur</u>, 722 F.2d at 1040); <u>see</u> <u>also</u> <u>Schaal</u>, 134 F.3d at 504 (noting that where "application of the correct legal standard could lead to only one conclusion, we need not remand.").

Generally, a "consulting physician's opinions or report should be given limited weight." <u>Cruz v. Sullivan</u>, 912 F.2d 8, 13 (2d Cir. 1990).  However, as part of his review of the evidence before him, an ALJ has the discretion to grant various degrees of weight to the opinion of such practitioners, <u>Diaz v. Shalala</u>, 59 F.3d 307, 313 n.5 (2d Cir. 1995), which may be greater than the weight awarded to a claimant's treating physician.  See <u>id.</u>; <u>Vanderpool</u>, 2014 WL 1979925, at *16 ("The opinions of consultive physicians may override those of a treating physician if they are supported by substantial evidence in the record.") (citing <u>Jones v. Shalala</u>, 900 F. Supp. 663, 669 (S.D.N.Y. 1995)).  Furthermore, as the Commissioner's regulations describe, opinions from these types of practitioners may be used to judge variables including, but not limited to, the severity of alleged impairments and the degree of residual functional capacity.  20 C.F.R. § 416.927(d)(2).

Heitz argues that the ALJ improperly rejected the opinion of his treating physician, Dr. Rametta.  Dr. Rametta had completed a form entitled "Medical Assessment of Ability to Do Work-Related Activities" in which she checked boxes indicating that Heitz could occasionally lift 20 to 50 pounds and frequently lift 10 pounds, and that Heitz could stand or walk for "less than two hours" of an eight-hour workday.  R. 422-23, 429-30.  In the portion of the form that asked "[w]hat are the medical findings that support this opinion," Dr. Rametta wrote: "Patient develops shortness of breath" for both assessments.  <u>Id.</u>

Heitz contends that the ALJ's rejection of Dr. Rametta's opinion on these points was unaccompanied by "adequate rationale," Pl. Mem. at 7, to satisfy the SSA's "good reasons"

14

requirement.  See Halloran, 362 F.3d at 32-33 (citing Schaal, 134 F.3d at 505) (internal quotation marks omitted); 20 C.F.R. §§ 404.1527(c)(2).

As discussed above, the ALJ found Dr. Rametta's opinion regarding the extent of Heitz's limitation both internally inconsistent and contradicted by other medical evidence in the record. R. 15.  With regard to Dr. Rametta's conclusion that Heitz was limited to carrying items weighing 20-50 pounds and could only stand or walk for two hours at a time, the ALJ noted that these determinations were unaccompanied by any "diagnosis or supportive findings," except for the statement that Heitz suffered from "shortness of breath."  Id.  The ALJ found this evidence unpersuasive, however, as her review of Dr. Rametta's notes suggested only "sporadic complaints" of shortness of breath, compare R. 200, 201, 204, 207-09 (references to history of shortness of breath) with R. 202-03, 205-06, 210-14 (records with no mention of Heitz suffering or complaining of shortness of breath).  Additionally the ALJ noted that Heitz's "clinical exams" were normal, as was his July 2012 spirometry test.  R. 15.[3]  That test gave a value of "99%."  R. 201 (spirometry of July 27, 2012); see also R. 204 (normal CT scan of chest and spirometry on March 27, 2012); R. 209 (spirometry normal on November 25, 2011).

The ALJ did, however, grant "some weight" to Dr. Rametta's opinion regarding Heitz's "moderate lifting limitations," because this conclusion aligned with Heitz's "hernia (asymptomatic) and early arthritis of the knees."  R. 15.  She also described Dr. Balderman's conclusions, which further supported a finding of only mild limitations.  Id.  While an ALJ is required to provide "good reasons" when she does not grant a treating physician's opinion

---

[3] A spirometer measures "flows and volumes, inspired and expired by the lungs, thus assessing pulmonary function."  Spirometer, Stedman's Medical Dictionary 1674 (27th ed. 2000).

controlling weight, Halloran, 362 F.3d at 32-33 (citations omitted), where the record itself makes

clear the reasoning behind an ALJ's decision, "we do not require that he have mentioned every

item of testimony . . . or have explained why he considered particular evidence unpersuasive or

insufficient," Petrie, 412 F. App'x at 407 (citations omitted).  Here, after granting only limited

weight to the opinion of Heitz's treating physician, the ALJ articulated specific reasons why she

concluded the opinion to be both internally inconsistent and unsupported by the medical

evidence, while providing specific examples of both.  R. 15.  This is sufficient to satisfy the

"good reasons" requirement.  See, e.g., Halloran, 362 F.3d at 32 (treating physician rule was

satisfied where ALJ granted limited weight to opinion of treating physician, but "explained the

consistency" of the opinion with the record as a whole, addressed specific findings of the

treating physician, and compared such findings with other medical evidence in the record);

Galowitz v. Astrue, 2012 WL 4762563, at *11 (S.D.N.Y. Aug. 20, 2012) (ALJ properly rejected

opinion of treating physician where it was inconsistent with the findings and opinions of the

claimant's consulting physicians and generally unsupported by the medical evidence); Mollo v.

Barnhart, 305 F. Supp. 2d 252, 262 (E.D.N.Y. 2004) (finding ALJ provided good reasons to

discount a treating physician's opinion where the ALJ "considered the nature of the treating

relationship, the lack of any evidence in support of [the treating physician's] opinion, and the

fact that his opinion was not supported by any other medical records").  Accordingly, remand on

this ground is not appropriate.

      B.    <u>Substantial Evidence</u>

      Heitz also argues that the ALJ's decision was not supported by substantial evidence.

Specifically, he takes issue with: (1) the overall clarity of the ALJ's decision; (2) the ALJ's

determination of his RFC; and (3) the ALJ's conclusion regarding his ability to perform past

relevant work.  We address each in turn.

1.    Clarity of the ALJ's Opinion

Heitz contends that the ALJ's determination regarding his "exertional capacities" is inconsistent and thus warrants remand.  Pl. Mem. at 6.  Specifically, Heitz notes that the ALJ's decision states that Heitz "cannot lift/carry 20 pounds frequently and cannot lift/carry 50 pounds occasionally[.]  Yet subsequently in her decision . . . wrote that [Heitz] can in fact perform such activities."  Id. (emphasis and internal citations omitted).  Heitz accurately notes the inconsistency.  Compare R. 13 with R. 15.  The initial description of Heitz's limitation, however, is stated only in a paragraph heading.  That statement is not reflected anywhere else in the ALJ's opinion and conflicts with (1) the ALJ's overall conclusion that Heitz can perform past relevant work and (2) the fact that Heitz's own treating physician, Dr. Rametta, had opined that Heitz was capable of lifting and carrying items weighing 20-50 pounds, R. 429, and the ALJ did not reject Dr. Rametta's opinion in its entirety, R. 15.  Additionally, the ALJ specifically found Heitz's testimony that he could only lift or carry 15 pounds and walk or stand for 15 minutes not credible, in light of Dr. Balderman's finding that Heitz could "do a full squat and move around the examining room without difficulty . . . [had] no instability or tenderness, redness, heat, swelling or effusion in any of the major joints . . . no evidence of muscle atrophy, sensory deficit or weakness . . . [and] had no treatment or medication for arthritis."  R. 13-14; see also R. 348-49.  Furthermore, the ALJ's opinion states explicitly the conclusion "that [Heitz] has the residual functional capacity to perform medium work, lifting/carrying 20 pounds, frequently and 50 pounds, occasionally."  R. 15.  Thus it is obvious that the statement in the paragraph heading was intended to state the opposite.  In similar circumstances, "courts have found typographical errors to be harmless if it is obvious from the opinion as a whole that the error is typographical and not

17

substantive." Van Valkenberg ex rel. B.G. v. Astrue, 2010 WL 2400455, at *13 (N.D.N.Y. May 27, 2010) (citing cases); accord Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (summary order) ("to the extent [claimant] notes a discrepancy between the credibility finding made at page 8 . . . [and] page 10, it is obvious from the opinion as a whole that the inclusion of the word 'not' in the latter finding represents a typographical error."); Wells v. Colvin, 87 F. Supp. 3d 421, 433 (W.D.N.Y. 2015) ("In reviewing the entirety of [doctor's] opinion, it is evident that the statement that 'there are restrictions to sitting, standing, and walking on even surfaces' was likely intended to state that there were no such restrictions.") (emphasis in original).

Additionally, the inconsistency is essentially irrelevant because the ALJ found that Heitz could perform his past relevant work as a security guard and there was no evidence that this work involved lifting or carrying.  See R. 28-30 (Heitz's description of the security guard job); R. 146 ("N/A" written in Heitz's SSA Work History Report to an inquiry as to whether the security job involved "[l]ifting and [c]arrying").

> ### 2.    Heitz's Residual Functional Capacity

As noted above, the ALJ found Heitz capable of performing:

> medium work, lifting/carrying 20 pounds, frequently and 50 pounds, occasionally.  [He] can sit, stand and/or walk for 8 hours in an average workday; he can climb, and kneel, and perform repetitive manipulation frequently (6 out of 8 hours throughout an 8-hour workday).  [Heitz] cannot be exposed to concentrated amounts of smoke, fumes, chemicals and dust, or frequently exposed to workplace hazards due to dizziness and daytime fatigue.

R. 15.  In doing so, the ALJ rejected Dr. Rametta's opinion as contrary to the "significant" medical evidence of record.  R. 15.  The ALJ similarly rejected Heitz's assertions during the hearing that he was "unable to work due to fatigue, shortness of breath, dizziness and an injury

to the right thumb," and could only "lift/carry 15 pound[s] [and] stand/or walk 15 minutes," as not credible.  R. 13-14.

We conclude that the ALJ could properly find that the medical evidence was inconsistent with the severity of impairment Heitz was claiming and instead supported the above RFC determination.  Dr. Balderman's October 2012 examination found that Heitz had full range of motion of the hips, ankles, wrists, shoulders, elbows, and forearms bilaterally, as well as full flexion, extension, and lateral flexion bilaterally in his cervical and lumbar spines.  R. 349. Heitz's joints also appeared "stable and nontender," with "[n]o redness, heat, swelling, or effusion."  Id.  He had no "cyanosis, clubbing, or edema" in the extremities, and no apparent muscle atrophy.  Id.  Dr. Balderman also determined that Heitz had a strength rating of  "5/5 in the upper and lower extremities," id., and, notwithstanding his hand injury from 1990, Heitz had intact hand and finger dexterity and a grip strength of 4+/5 in the right hand and 5/5 in his left. Id.  This determination is further supported by Heitz's own testimony that he occasionally constructs jigsaw puzzles, R. 36, 348, and can complete activities of daily living without assistance, see R. 155, 348.  Although Dr. Balderman did not make specific conclusions regarding the extent of Heitz's lifting or carrying limitations, his examination and findings as a whole imply that only minimal such limitations exist.  See Cillari v. Colvin, 2015 WL 1433371, at *22 n.46 (S.D.N.Y. Mar. 30, 2015) (accepting a consulting physician's omission regarding limitations in sitting as "reasonably impl[ying] that [he] opined that Plaintiff had no limitation with respect to sitting," when viewing the report as a whole).  Indeed, Dr. Balderman concluded that Heitz had only "[m]ild degenerative disease of the knees [and] . . . [m]ild limitation[s] in [the] use of [his] right hand for repetitive motor work, [as well as] in repetitive kneeling and climbing."  R. 349-50.

19

Heitz's reliance on Dr. Rametta's conclusions to the contrary, as noted above, is not persuasive.  Dr. Rametta's determinations regarding carrying, lifting, walking, and standing were based solely in her finding that Heitz "developed shortness of breath," see, e.g., R. 422-23, 429-30, a finding that was not well supported by Dr. Rametta's own records, see R. 202-03, 205-06, 210-14.  Although not directly suggested by Dr. Rametta as a basis for her finding of physical limitation, we note that both Dr. Rametta's February 24, 2012, report, R. 205, and Crystal Run's March 9, 2012, CT scan analysis, R. 234, indicated that Heitz suffered from Chronic Obstructive Pulmonary Disease, which can cause breathing difficulty.  These results, however, were not consistent, as another CT scan and spirometry analysis performed less than a month later, on March 27, 2012, reported "normal" findings, R. 204, and Heitz appears to manage his breathing issues through the use of an inhaler, R. 32-33.  Indeed, treatment records from his cardiologist recommended that Heitz start engaging in an exercise program.  R. 251, 253, 355-59.  Heitz also argues that his diagnosis of severe obstructive sleep apnea supports Dr. Rametta's finding of shortness of breath, which in turn should support her finding of physical limitations.  Pl. Mem. at 7; see also R. 373, 427.  However, nothing in the record suggests his nighttime sleep apnea bears any relation to his ability to breathe while awake.  Indeed, reports from Dr. Rametta suggest that during the period in which Heitz complained of sleep apnea, he no longer reported shortness of breath.  See, e.g., R. 367-68, 370-73.  Finally, Heitz's failure to seek treatment options, such as a CPAP machine, further supports the finding that his sleep apnea did not produce symptoms with the degree of severity Heitz describes.

With regard to Heitz's complaints of severe daytime fatigue, chest pains, exhaustion, and dizziness, see, e.g., R. 32, 367-68, 372, the ALJ properly found the alleged severity of these limitations inconsistent with Heitz's treatment history and the medical record as a whole.

Although Heitz often reported some degree of tiredness and fatigue during his visits with Dr.

Rametta, these symptoms began as early as January 25, 2011, see R. 212, ten months prior to

Heitz leaving his position as an exterminator, R. 25, 144, which suggests his fatigue was not

severe enough to impede his ability to work.  Indeed, in a January 2012 examination performed

by Dr. Edward Croen, Heitz reported no fatigue whatsoever.  R. 335.  Heitz was, however,

diagnosed with sleep apnea in January 2012, which could conceivably exacerbate his symptoms

of fatigue.  R. 371.  Nevertheless, Heitz sought no treatment for his symptoms and continued to

drive though he had been instructed to "[a]void driving and/or operation of heavy machinery

while sleepy."  R. 25, 427.  Accordingly, the ALJ could properly disregard the level of

impairment Heitz attributed to his fatigue.  See generally Snell v. Apfel, 177 F.3d 128, 136 (2d

Cir. 1999) (noting that where a claimant's impairment, present while the claimant is working,

does not deteriorate or become more severe, the claimant cannot claim to have become disabled

based on that impairment); see also Allen v. Comm'r of Soc. Sec., 2014 WL 5288999, at *5

(N.D.N.Y. Oct. 15, 2014) (same).

The medical evidence suggests similar conclusions with regard to Heitz's complaints of

dizziness and chest pain.  Beyond Heitz's own testimony, see R. 27, 28, 32, the only medical

evidence in the record that makes reference to dizziness is Dr. Croen's January 2012

examination, in which he reports that Heitz suffered from "[n]o dizziness" at all.  R. 335.

Although Heitz's reports of chest pain are more common, they occur sporadically and appear to

have been non-severe.  Heitz reported "atypical chest discomfort" or chest pain to Dr. Rametta

on March 27, 2012, April 13, 2012, July 27, 2012, and November 13, 2012, but all of these

reports also note that Heitz's chest was "clear" and that his "cardio" examination showed

"[r]egular sinus rhythm."  R. 372, 375, 377, 378.  Heitz also reported chest pain during a visit to

Orange Regional Medical Center on May 11, 2012, but upon examination, practitioners found "no left ventricular global or regional wall motion abnormalities . . . no significant coronary artery disease . . . [n]ormal hemodynamics," and an overall normal coronary anatomy.  R. 355-56.  Finally, during two visits to Crystal Run Healthcare Center on September 23 and October 23, 2013, practitioners reported, in their cardiovascular "[r]eview of [s]ystems" analysis, some degree of chest pain, as well as "claudication, edema and irregular heartbeat/palpitations," R. 383-85, 389-90, but both reports also note that Heitz "present[ed] with . . . [n]o CP [chest pain] or SOB [shortness of breath]" and upon physical examination state that his cardiovascular system presents "[r]egular rhythm . . . [n]o murmurs, gallops, or rubs . . . [and that] [n]o edema is present."  Id.

Notwithstanding these occasional complaints of chest pain, Heitz also reported "[n]o chest pain" to Dr. Croen in January 2012, R. 335, and his October 2012 examination with Dr. Balderman showed a regular heart rhythm, and "[n]o significant chest wall abnormality."  R. 348-49.  Heitz also made no reference to chest pain during many of his visits with Dr. Rametta. Indeed, at these visits Dr. Rametta continually found that Heitz's chest was "clear, [with] no rales, [or] rhonchi" and that his "cardio" examination revealed a "[r]egular sinus rhythm."  See, e.g., R. 200-02, 205-14 (noting such findings in Dr. Rametta's reports from April 29, 2010 to August 20, 2012), and R. 367-70 (noting such findings in Dr. Rametta's reports from March 5, 2013 to October 17, 2013); but see R. 323 (noting "[s]cattered rhonci[] and wheezing" on April 19, 2010).

The Second Circuit has held that "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings."  Taylor v. Barnhart, 83 F. App'x 347, 350 (2d Cir. 2003) (summary order) (quoting Marcus v. Califano, 615 F.2d 23,

27 (2d Cir. 1979)).  In such circumstances, however, the "ALJ is nonetheless empowered to exercise discretion to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  Id. (internal quotation marks omitted).  Where an ALJ rejects a claimant's testimony regarding the extent of pain as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record."  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)); accord Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999).  Here, the ALJ carefully reviewed the medical evidence in the record with regard to Heitz's reports of pain and limitations.  Thus, the ALJ could properly discount Heitz's testimony of pain in determining his RFC.

### 3.   Heitz's Ability to Perform Past Relevant Work

We next address the ALJ's finding that Heitz's ability to perform "medium work" would allow him to perform his past relevant work "as [a] [s]ecurity [g]uard and [e]xterminator, as actually performed."  R. 15.  To overturn an ALJ's finding that a claimant's RFC would permit him to engage in past relevant work, "the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally." Jasinski v. Barnhart, 341 F.3d 182, 185 (2d Cir. 2003) (emphasis in original) (citing Jock v. Harris, 651 F.2d 133, 135 (2d Cir. 1981)) (further citations omitted).  The ALJ in this matter, however, did not find that Heitz could perform his past relevant work "as it is generally performed in the national economy," Sweet v. Astrue, 32 F. Supp. 3d 303, 319 (N.D.N.Y. 2012), but rather found that Heitz could complete past relevant work "as actually performed," R. 15. Because we conclude that the ALJ's determination that Heitz is capable of performing his past

security work "as actually performed" is supported by substantial evidence, we need not reach the issue of whether Heitz is capable of performing such work "as generally performed."

As Heitz described at the administrative hearing, his past work as a security guard involved "checking construction buildings . . . climb[ing] up and down steps, [and] check[ing] various floors."  R. 28.  Heitz's own "Work History Report" similarly reflected that the job did not require kneeling, crouching, crawling, handling large objects, reaching, lifting, or carrying. R. 146.  Although Heitz was sent to guard multiple buildings during his tenure as a guard, he was generally assigned to a single building or site each day.  R. 28-29.  Generally, employment as a security guard is performed at the "light" level, as defined by the Dictionary of Occupational Titles ("DOT").  See Young v. Astrue, 2010 WL 5779346, at *7 (S.D.N.Y. Dec. 29, 2010) (noting that the DOT "describes the exertion level demanded of the job of a security guard in any industry as 'light'").  "Light work is defined in SSA regulations as lifting no more than twenty pounds at a time with frequent lifting or carrying objects weighing up to ten pounds."  Id. (citation and internal quotation marks omitted); see also 20 C.F.R. 404.1567(b).  Nothing in the record suggests that Heitz's specific position as a security guard required greater exertion than that defined at the "light" level.  Adopting the ALJ's RFC determination that Heitz can perform "medium" level work, stand or walk for 8 hours a day, and climb or kneel for 6 hours a day, we find that Heitz's past work as a security guard easily falls within his physical capabilities.

Heitz argues that he is unable to perform his past work as a security guard, because of the ALJ's RFC restriction that Heitz "cannot be exposed to concentrated amounts of smoke, fumes, chemicals and dust, or frequently exposed to workplace hazards due to dizziness and daytime fatigue."  R. 15.  Essentially, Heitz contends that the position of "construction-site security" inherently exposes the worker to levels of dust and workplace hazards that would preclude this

type of past work.  See Pl. Mem. at 8 ("Did not the plaintiff's past jobs in construction-site

security and pest extermination involve exposure to dust, fumes, and chemicals? Do not

construction sites pose hazards to an individual who suffers dizziness and fatigue?").  Heitz does

not, however, cite to any evidence in the record that suggests during his previous employment he

was ever exposed to concentrated levels of dust, fumes, and chemicals, or that he was

"frequently" exposed to workplace hazards.  Without anything beyond pure speculation that such

dangers existed at levels that would preclude his past work, it was reasonable for the ALJ to

conclude that Heitz could performs his past work as a security guard.[4]

IV.   CONCLUSION

The Commissioner's motion for judgment on the pleadings (Docket # 15) is granted.

The plaintiff's motion (Docket # 10) is denied.  The Clerk is requested to enter judgment and to

close this case.

SO ORDERED.

Dated: August 16, 2016
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[4] Having found Heitz capable of performing his prior "light" work as a security guard, we
need not review the ALJ's determination that Heitz could also perform his past work as an
exterminator.

25